Graham B. LippSmith (SBN 221984)
g@lippsmith.com
MaryBeth LippSmith (SBN 223573)
mb@lippsmith.com
Jaclyn L. Anderson (SBN 258609)
jla@lippsmith.com
**LIPPSMITH LLP**
555 S. Flower Street, Suite 4400
Los Angeles, CA  90071
Tel: (213) 344-1820 / Fax: (213) 513-2495

David S. Almeida (*Pro Hac Vice forthcoming*)
david@almeidalawgroup.com
Elena Belov (*Pro Hac Vice forthcoming*)
elena@almeidalawgroup.com
**ALMEIDA LAW GROUP LLC**
849 W. Webster Avenue
Chicago, IL 60614
Tel: (312) 576-3024

Attorneys for Plaintiff and the Putative Classes

## IN THE UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| JANE DOE, individually and on behalf of all others similarly situated, | Case No. 2:23-cv-02190 |
| Plaintiff, | **CLASS ACTION COMPLAINT FOR:** |
| v. | 1. **VIOLATION OF CAL. PENAL CODE §§ 630, *et seq.*;** |
| CEREBRAL, INC., a Delaware corporation, | 2. **VIOLATION OF CAL. CIVIL CODE §§ 56, *et seq.*;** |
| Defendant. | |

CLASS ACTION COMPLAINT

3. **INVASION OF PRIVACY UNDER CALIFORNIA'S CONSTITUTION;**

4. **COMMON LAW INVASION OF PRIVACY – INTRUSION UPON SECLUSION;**

5. **BREACH OF IMPLIED CONTRACT;**

6. **BREACH OF CONFIDENCE;**

7. **VIOLATIONS OF 18 U.S.C. § 2511(1), *et seq*.;**

8. **VIOLATIONS OF 18 U.S.C. § 2511(3)(a), *et seq*.;**

9. **VIOLATION OF 18 U.S.C. § 1030, *et seq*.;**

10. **VIOLATION OF CAL. BUS. & PROF. CODE § 17200, *et seq*. – UNLAWFUL BUSINESS PRACTICES; and**

11. **VIOLATION OF CAL. BUS. & PROF. CODE § 17200, *et seq*. – THE UNFAIR COMPETITION LAW**

**<u>JURY TRIAL DEMANDED</u>**

1

CLASS ACTION COMPLAINT

## CLASS ACTION COMPLAINT

Plaintiff Jane Doe ("Plaintiff") brings this class action lawsuit individually and on behalf of all others similarly situated (the "Class Members") against Cerebral, Inc. ("Cerebral" or "Defendant"). The allegations contained in this class action complaint are based on Plaintiff's personal knowledge, due investigation, and upon information and good faith belief.

## NATURE OF THE ACTION

1.      This class action lawsuit challenges Cerebral's practice of disclosing its users' confidential and highly sensitive medical and other private information to third parties in violation of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), California statutory and common law, as well as its own privacy policies and representations.

2.      Cerebral breached confidentiality and violated Plaintiff's privacy when it did not seek – and certainly did not receive – any consent for disclosure of personal and medical information before it unlawfully disclosed Plaintiff's personally identifiable information ("PII") and protected health information ("PHI") (collectively "Private Information").

3.      Defendant admitted as much on March 1, 2023, when it reported a years-long data breach of PII and PHI of more than 3 million patients to the U.S.

1   Department of Health and Human Services ("HHS")[1] and issued a Notice of

2   HIPAA Privacy Breach.[2]

3          4.     Information about a person's physical and mental health is among

4   the most confidential and sensitive information in our society and the mishandling

5   of medical information can have serious consequences including, but certainly not

6   limited to, discrimination in the workplace or denial of insurance coverage.

7          5.     Defendant Cerebral is a tele-therapy and medication management

8   company purportedly focused on helping people suffering with insomnia, anxiety

9   and depression, among other mental health issues.

10         6.     Cerebral owns, maintains and controls a website, www.cerebral.com

11  (the "Website") and a mobile application (the "App" and collectively with the

12  Website, the "Properties"). Patients and consumers who use the Website are

13  referred to herein as "Users."

14

_____

15  [1]     *See Cases Currently Under Investigation*,
    https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf, HHS.GOV (last visited Mar.
16  21, 2023); *Notice of HIPAA Privacy Breach*,
    https://cerebral.com/static/hippa_privacy_breach-
17  4000c6eb21449c2ecd8bd13706750cc2.pdf, CEREBRAL.COM (last visited Mar. 21,
    2023) (Despite "determining" that it was unlawfully disclosing its users' Private
18  Information to third parties without proper consent on January 3, 2023, it took
    Defendant another ***two*** months to begin notifying authorities and affected victims
19  of its illegal conduct).
    [2]     *Notice of HIPAA Privacy Breach*,
20  https://cerebral.com/static/hippa_privacy_breach-
    4000c6eb21449c2ecd8bd13706750cc2.pdf, CEREBRAL.COM (last visited Mar. 21,
21  2023).

CLASS ACTION COMPLAINT

7.      Despite the stigmas that unfortunately are so often associated with mental health issues and treatments, Cerebral intentionally chose to put its profits over the privacy of its Users, which number several million.

8.      Specifically, Cerebral installed certain tracking technologies on its Properties in order to intercept and to send Private Information to third parties such as Meta Platforms, Inc. d/b/a Facebook ("Facebook") and/or Google LLC without the informed consent of its Users.

9.      The information illegally sent to these third parties can be associated with other information to create very fulsome user profiles that can be mined for marketing and other commercial purposes. For example, in the case of information sent by Cerebral to Facebook, such information was then linked to Plaintiff's unique Facebook user ID ("Facebook ID" or "FID") so that there was no anonymity in that Facebook and/or any third parties who were able to access the information would be able to associate such personal health data with Plaintiff and all class members.

10.     Cerebral purports to do many things for its patients. For one, its Website boldly proclaims that Cerebral delivers high-quality, best possible, effective, safe care in a secure manner without compromising confidentiality of patients' data:

///

///

CLASS ACTION COMPLAINT

**Our Promise to Our Patients**

**At Cerebral, patients come first**.

We make high-quality mental health care both accessible and affordable to help you feel better, faster. Ensuring best clinical outcomes is at the heart of our mission. Our care experts follow the latest and best science and evidence-based guidelines to make sure we're giving you the best care possible on your journey to wellness.

**How do we ensure the highest quality of care?**

We follow a clinical code of ethics, derived from the Institute of Medicine's Six Domains of Clinical Quality, as guiding principles for care.

**We deliver care that is:**
**Secure**
We use the latest information security technology to protect your data, which is not shared without your consent, and will only be used internally to improve clinical care.[3]

11.     Despite this representation (as well as many other similar ones in its privacy policy and elsewhere) that its Users' data "is not shared without [] consent," Cerebral has publicly acknowledged that it had been using invisible trackers from Google, Facebook, TikTok and other third parties on its online services since October 12, 2019.

12.     Despite warnings that healthcare companies were disclosing Private Information to digital marketing companies by embedding and using Meta Pixels

---

[3]     *We're Cerebral*, https://cerebral.com/about-cerebral, CEREBRAL.COM (last visited Mar. 21, 2023) (emphasis added).

(and similar technologies) as far back as at least February 2020,[4] Cerebral did not

publicly acknowledge its collection and dissemination of its Users' Private

Information until March 6, 2023 when it finally posted a notice on its Website.[5]

      13.    Upon information and good faith belief, and based on Cerebral's

Notice of HIPAA Data Breach, the categories of private information disclosed by

Cerebral without consent included: (i) names, (ii) phone numbers, (iii) mailing

addresses; (iv) email addresses, (v) dates of birth, (vi) internet protocol ("IP")

addresses, (vii) Cerebral client ID numbers, (viii) other PII, (ix) health conditions

and concerns, (x) treatment plans, (xi) appointments and other clinical

information, (xii) health insurance and pharmacy information and (xiii) other

health information.[6]

      14.    Upon information and good faith belief and based on Cerebral's

Privacy Policy which lists types of information collected by Defendant,

---

[4]    Molly Osberg & Dhruv Mehrotral, *The Spooky, Loosely Regulated World of Online Therapy*, JEZEBEL (Feb. 19, 2020), available at https://jezebel.com/the-spooky-loosely-regulated-world-of-online-therapy-1841791137 (last visited March 21, 2023); *see also* Timothy M. Hale, PhD & Joseph C. Kvedar, MD, *Privacy and Security Concerns in Telehealth*, (Dec. 2014), https://journalofethics.ama-assn.org/article/privacy-and-security-concerns-telehealth/2014-12, AMA JOURNAL OF ETHICS (last visited Mar. 21, 2023) (illustrating that problems with privacy and telehealth apps started to surface as early as 2014).

[5]    *Notice of HIPAA Privacy Breach*, https://cerebral.com/static/hippa_privacy_breach-4000c6eb21449c2ecd8bd13706750cc2.pdf, CEREBRAL.COM (last visited March 20, 2023).

[6]    *Id.*

CLASS ACTION COMPLAINT

information disclosed by Cerebral without consent may include a lot more

sensitive personal data, including billing addresses; telephone numbers; Social

Security Numbers; protected demographic information such as date of birth,

gender, and race/ethnicity; payment details like billing address and credit or debit

card numbers; identity-verification information; health-related information such

as medical history, physician referrals, prescriptions, lab results, lifestyle and

personal preferences; other related health information, such as patients' physical

and emotional characteristics; audio, images, and video of patients; log-in

credentials; communications with Providers through the Services; whether the

person in question is a current user; product interests; location data; frequency

and/or date and time of patients' activities on Defendant's Services; usage data

and information about users' Internet connection; mobile device ID; and "any

other information" patients provided to Cerebral about themselves or others,

including information from third-party apps (for example, photos, health

information, and/or audio clips).[7]

15.     Defendant owed common law, statutory and regulatory duties to

keep Plaintiff's and class members' communications and medical information

safe, secure, and confidential.

---

[7] *See Cerebral, Inc. Privacy Policy*, https://cerebral.com/privacy-policy, Cerebral.com (last visited March 21, 2023).

CLASS ACTION COMPLAINT

16.     First, the disclosure of Plaintiff's and class members' Private Information via the Pixel contravenes the letter and spirit of HIPAA's "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") which governs how health care providers must safeguard and protect Private Information.

17.     While healthcare organizations regulated under HIPAA may use third-party tracking tools, such as Google Analytics or Meta Pixel, they can do so only in a very limited way, to perform analysis on data key to operations:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data… ***If such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI.*** [8]

_____

[8]     *Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html, HHS.GOV (last visited March 21, 2023) (HIPAA Identifiers include name; address (all geographic subdivisions smaller than state, including street address, city county, and zip code); all elements (except years) of dates related to an individual (including birthdate, admission date, discharge date, date of death, and exact age); telephone numbers; email address; medical record number; health plan beneficiary number; account number; device identifiers and serial numbers; web URL; internet protocol (IP) address; and any other characteristic that could uniquely identify the individual).

CLASS ACTION COMPLAINT

18.     Simply put, further to the HIPAA Privacy Rule, covered entities such as Defendant are simply ***not*** permitted to use tracking technology tools (like pixels) in a way that exposes patients' Private Information to any third-party without express and informed consent.

19.     Lest there be any doubt of the illegal nature of Defendant's practice, the Office for Civil Rights (OCR) at HHS has made clear, in a recent bulletin entitled *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, that the unlawful transmission of such protected information violates HIPAA's Privacy Rule:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. ***For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.***[9]

20.     Moreover, Defendant breached its statutory and common law obligations to Plaintiff and class members by, *inter alia*,: (i) failing to adequately review its marketing programs and web based technology to ensure its Properties were safe and secure; (ii) failing to remove or disengage technology that was

---

[9] *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates,* available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html, HHS.GOV (emphasis added) (last visited Mar. 21, 2023).

CLASS ACTION COMPLAINT

known and designed to share web-users' information; (iii) failing to obtain the written consent of Plaintiff and class members to disclose their Private Information to Facebook or others; (iv) failing to take steps to block the transmission of Plaintiff's and class members' Private Information through Facebook Pixels; (v) failing to warn Plaintiff and class members that their Private Information was being shared with third parties without express consent; and (vi) otherwise failing to design, and monitor its Properties to maintain the confidentiality and integrity of patient Private Information.

21.     Finally, Cerebral's acknowledged practice also violated its own privacy policy and affirmative representations as to how it will treat confidential Private Information. Defendant's Privacy Policies ("Privacy Policies") falsely represent to Users that it will not share Private Information for marketing purposes unless Users provide written permission.  These policies also promise that Cerebral will maintain the privacy of Users' protected health information and will notify affected individuals should a breach of unsecured protected health information take place.[10]

22.     As a result of Defendant's conduct, Plaintiff and class members have suffered numerous injuries, including: (i) invasion of privacy; (ii) lost time and opportunity costs associated with attempting to mitigate the actual consequences

---

[10]     *Notice of Privacy Practices*, https://cerebral.com/privacy-practices, CEREBRAL.COM (last visited Mar. 21, 2023).

CLASS ACTION COMPLAINT

1    of the Pixel; (iii) loss of benefit of the bargain; (iv) diminution of value of the

2    Private Information; (v) statutory damages; and (vi) the continued and ongoing

3    risk to their Private Information.

4    **JURISDICTION AND VENUE**

5          23.    This Court has subject matter jurisdiction further to the Class Action

6    Fairness Act of 2005, 28 U.S.C. § 1332(d), because the aggregate amount in

7    controversy exceeds $5 million, exclusive of interest and costs, and minimal

8    diversity exists because at least one class member and Defendant are citizens of

9    different states.

10         24.    This Court has federal question jurisdiction further to 29 U.S.C. §

11   1331 because this complaint alleges violation of federal laws.

12         25.    The Court has personal jurisdiction over Defendant Cerebral because

13   its principal place of business and headquarters are located in Walnut, California,

14   and it regularly engages in extensive business throughout the country and the

15   State of California.

16         26.    Venue is proper in this District pursuant to 18 U.S.C.§ 1391(b)(1)

17   because Defendant's principal place of business is in this judicial district and a

18   substantial part of the events or omissions giving rise to the claims asserted herein

19   occurred in this judicial district.

20   ///

21   ///

10
CLASS ACTION COMPLAINT

1

## THE PARTIES

2

*Plaintiff*

3        27.    Plaintiff Jane Doe is, and at all relevant times was, an individual

4    residing in Fife, Pierce County, in the State of Washington.

5        28.    Plaintiff received healthcare services from Defendant in 2021 and

6    accessed those services via Defendant's Website and mobile applications ("Web

7    Properties"). While using Defendant's Web Properties, Plaintiff communicated

8    sensitive – and what she expected to be confidential – personal and medical

9    information to Defendant.

10       29.    Plaintiff used Defendant's Web Properties to communicate with

11   healthcare providers, research particular medical concerns and treatments, fill out

12   forms and questionnaires, schedule and attend appointments, and perform other

13   tasks related to her specific medical inquiries and treatment.

14       30.    In the course of using Defendant's Web Properties, Plaintiff

15   provided her name, phone number, email address, date of birth, and other PII. As

16   a result of the Meta Pixel Defendant chose to install on its Web Properties, that

17   information was intercepted, viewed analyzed, and used by unauthorized third

18   parties.

19       31.    While using Defendant's services, Plaintiff completed Cerebral's

20   online mental health self-assessment and communicated information regarding

21   her health condition and concerns and other PHI. As a result of the Meta Pixel

Defendant chose to install on its Web Properties, this information was intercepted, viewed analyzed, and used by unauthorized third parties.

32.    While using Defendant's services, Plaintiff communicated and received information regarding her appointments, treatments, medications, and clinical information. As a result of the Meta Pixel Defendant chose to install on its Web Properties, this information was intercepted, viewed analyzed, and used by unauthorized third parties.

33.    Plaintiff Jane Doe accessed Defendant's Web Properties to receive healthcare services from Defendant or Defendant's affiliates at Defendant's direction and with Defendant's encouragement.

34.    As a medical and mental health patient using Defendant's health services, Plaintiff Jane Doe reasonably expected that her online communications with Defendant were solely between herself and Defendant, and that such communications would not be transmitted or intercepted by a third party. Plaintiff Jane Doe also relied on Defendant's Privacy Policies in reasonably expecting Defendant would safeguard her Private Information. But for her status as Defendant's patient and Defendant's representations via its Privacy Policies, Plaintiff Jane Doe would not have disclosed her Private Information to Defendant.

///

///

CLASS ACTION COMPLAINT

35.     During her time as Defendant's patient, Plaintiff Jane Doe never consented to the use of her Private Information by third parties or to Defendant enabling third parties, including Facebook, Google, TikTok, and others to access or interpret such information.

36.     Notwithstanding, through the Meta Pixel and similar technologies embedded on Defendant's Web Properties, Defendant transmitted Plaintiff Jane Doe's Private Information to third parties, including Facebook, Google, TikTok, and others.

***Defendant***

37.     Defendant Cerebral, Inc. is incorporated in the State of Delaware, and its principal place of business is located at 340 S. Lemon Avenue in Walnut, California 91789.

## **FACTUAL ALLEGATIONS**

**A.     *The Use of Tracking Technologies in the Healthcare Industry.***

38.     Tracking tools[11] installed on many hospitals', telehealth companies'

---

[11]     The Office for Civil Rights at the HHS has defined such "tracking technology" as a script or code on a website or mobile app used to gather information about users as they interact with the website or mobile app. After information is collected through tracking technologies from websites or mobile apps, it is then analyzed by owners of the website or mobile app ("website owner" or "mobile app owner"), or third parties, to create insights about users' online activities. *See Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates,* https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html, HHS.GOV (last visited Mar. 21, 2023).

13

1    and other healthcare providers' websites (and other digital properties) are

2    collecting patients' and other visitors' confidential and private health

3    information—including details about their medical conditions, prescriptions, and

4    appointments, among *many* other things—and sending that information to third

5    party vendors without prior, informed consent.[12]

6         39.    These pixels are snippets of code that track internet and app users as

7    they navigate through a website, logging which pages they visit, which buttons

8    they click, and certain information they enter into forms. In exchange for

9    installing the pixels, third party platforms (*e.g.,* Facebook and Google) provide

10   website owners analytics about the advertisements they have placed as well as

11   tools to target people who have visited their web properties.

12        40.    While the information captured and disclosed without permission

13   may vary depending on the pixel(s) embedded, these "data packets" can be

14   extensive, sending, for example, not just the name of a physician and field of

15   medicine, but also the first name, the last name, email address, phone number and

16   zip code and city of residence entered into the booking form. In addition, that data

17   is linked to a specific internet protocol ("IP") address.

18

19   _____

20   [12]     *See, e.g.,* Todd Feathers, Simon Fondrie-Teitler, Angie Waller & Surya Mattu, *Facebook Is Receiving Sensitive Medical Information from Hospital Websites*, THE MARKUP (June 16, 2022), https://themarkup.org/pixel-

21   hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites (last visited Mar. 21, 2023).

14

CLASS ACTION COMPLAINT

41.     The Meta Pixel, for example, sends information to Facebook via scripts running in a person's internet browser so each data packet comes labeled with an IP address that can be used in combination with other data to identify an individual or household.

42.     In addition, if the person is (or recently has) logged into Facebook when they visit a particular website when a Meta Pixel is installed, some browsers will attach third-party cookies—another tracking mechanism—that allow Meta to link pixel data to specific Facebook accounts.

43.     With substantial work and technical know-how, internet users can sometimes circumvent this browser-based wiretap technology. This is why third parties bent on gathering Private Information, like Facebook, implement workarounds that cannot be evaded by savvy users. Facebook's workaround, for example, is called Conversions API (CAPI). CAPI is an effective workaround because it does not intercept data communicated from the user's browser. Instead, Conversions API "is designed to create a direct connection between [Web hosts'] marketing data and [Facebook]." Thus, the communications between patients and Defendant, which are necessary to use Defendant's Website, are actually received by Defendant and stored on its server before Conversions API collects and sends the Private Information contained in those communications directly from Defendant to Facebook. Client devices do not have access to host servers and thus cannot prevent (or even detect) this transmission.

CLASS ACTION COMPLAINT

44.     While there is no way to confirm with certainty that a Web host like Defendant has implemented workarounds like Conversions API without access to the host server, companies like Facebook instruct Defendant to "[u]se the Conversions API in addition to the [] Pixel, and share the same events using both tools," because such a "redundant event setup" allows Defendant "to share website events [with Facebook] that the pixel may lose."[13] Thus, it is reasonable to infer that Facebook's customers who implement the Meta Pixel in accordance with Facebook's documentation will also implement the Conversions API workaround.

45.     The third parties to whom a website transmits data through pixels and associated workarounds do not provide any substantive content relating to the user's communications. Instead, these third parties are typically procured to track user data and communications for marketing purposes of the website owner.

46.     Thus, without any knowledge, authorization, or action by a user, a website owner like Defendant can use its source code to commandeer a user's computing device, causing the device to contemporaneously and invisibly re-direct the users' communications to third parties.

///

---

[13] *See Best practices for Conversions API,* https://www.facebook.com/business/help/308855623839366?id=818859032317965, FACEBOOK.COM (last visited March 21, 2023).

CLASS ACTION COMPLAINT

47.     In this case, Defendant employed just such devices (the Meta Pixel, CAPI and similar technologies) to intercept, duplicate, and re-direct Plaintiff's and Class Members' Private Information to third parties like Facebook and Google.

48.     Investigative journalists have published several reports detailing the seemingly ubiquitous use of tracking technologies on hospitals', health care providers' and telehealth companies' digital properties to surreptitiously capture and to disclose their Users' personal health information ("PHI").[14]

49.     Regarding telehealth companies specifically, the aptly titled report *"Out Of Control": Dozens of Telehealth Startups Sent Sensitive Health Information to Big Tech Companies*, a joint investigation by STAT and The Markup of 50 direct-to-consumer telehealth companies found that virtual care websites were providing sensitive medical information they collect to the world's largest advertising platforms.[15]

---

[14]     *See, e.g.*,  Dave Muoio & Annie Burky, *Advocate Aurora, WakeMed get served with class action over Meta's alleged patient data mining*, FIERCE HEALTHCARE (Nov. 4, 2022), https://www.fiercehealthcare.com/health-tech/report-third-top-hospitals-websites-collecting-patient-data-facebook (last visited Mar. 20, 2023).

[15]     Todd Feathers, Katie Palmer (STAT) & Simon Fondrie-Teitler, *"Out Of Control": Dozens of Telehealth Startups Sent Sensitive Health Information to Big Tech Companies: An investigation by The Markup and STAT found 49 out of 50 telehealth websites sharing health data via Big Tech's tracking tools*, MARKUP (Dec. 13, 2022), https://themarkup.org/pixel-hunt/2022/12/13/out-of-control-dozens-of-telehealth-startups-sent-sensitive-health-information-to-big-tech-companies (last visited Mar. 21, 2023).

CLASS ACTION COMPLAINT

50.     Many telehealth sites had at least one tracker—from Meta, Google, TikTok, Bing, Snap, Twitter, LinkedIn or Pinterest—that collected patients' answers to medical intake questions.[16]

51.     These issues are particularly acute when it comes to the rapidly expanding world of digital mental health providers.

52.     Of all the information the average internet user shares with the technology companies, health data—and especially mental health data[17]– is some of the most valuable and controversial.

53.     Despite dealing with sensitive and personal issues like depression, suicide, domestic violence and PTSD, these websites and applications, including Defendant's, appear to value the monetization of user data over all else.[18]

///

///

---

[16]     *See id.* (noting, "[t]rackers on 25 sites, including those run by industry leaders Hims & Hers, Ro, and Thirty Madison, told at least one big tech platform that the user had added an item like a prescription medication to their cart, or checked out with a subscription for a treatment plan").

[17]     Mental health sites are collecting far more data than is necessary and certainly more than is disclosed to Users. As detailed in the Jezebel article, social media behemoths like Facebook are often notified each and every time a person opens a particular mental health app, essentially signaling to the social media company how often those patients are going to a session and when they booked appointments.

[18]     *See, e.g., Top Mental Health and Prayer Apps Fail Spectacularly at Privacy, Security*, MOZILLA (May 2, 2022), https://foundation.mozilla.org/en/blog/top-mental-health-and-prayer-apps-fail-spectacularly-at-privacy-security/ (last visited Mar. 20, 2023).

18

54.     These mental health apps are a data harvesting bonanza as "[n]early all the apps reviewed gobble up users' personal data . . . Further, some apps harvest additional data from third-party platforms (like Facebook), elsewhere on users' phones, or data brokers."[19]

55.     It is not difficult to imagine what use a social media company might have for tracking a person who is struggling with their mental health, and how often they seek therapy. In 2017, a leaked Facebook sales pitch showed the company boasting of how its algorithm could identify and target teenagers who were feeling "insecure" and "worthless," "overwhelmed" or "anxious."

56.     Moreover, there is unfortunately still some stigma for those struggling with mental health issues. Such data sharing could be particularly damaging to patients seeking care for substance use disorders, among many other problematic outcomes for Users.[20]

///

---

[19]    *Id.* ("[O]thers are taking advantage of this. Silicon Valley investors are pouring hundreds of millions of dollars into these apps. Insurance companies get to collect extra data on the people they insure. And data brokers are enriching their databases with even more sensitive data").

[20]    *See* Lindsey Ellefson, *Telehealth Sites Put Addiction Patient Data at Risk: New research found pervasive use of tracking tech on substance-abuse-focused health care websites, potentially endangering users in a post-Roe world*, WIRED (Nov. 16, 2022), https://www.wired.com/story/substance-abuse-telehealth-privacy-tracking-tech/ (last visited March 20, 2023) ("While the sharing of any kind of patient information is often strictly regulated or outright forbidden, it's even more verboten in addiction treatment, as patients' medical history can be inherently criminal and stigmatized.").

CLASS ACTION COMPLAINT

57.     And, while mobile health options have been celebrated by doctors and advocates as a way to expand treatment for substance use disorders, the tangible, real-world implications and potential for abuse is staggering:

> [T]he sensitive information people share during treatment for substance use disorders could easily impact their employment status, ability to get a home, custody of their children, and even their freedom. Health care providers and lawmakers recognized long ago that the potential threat of losing so much would deter people from getting life-saving help and set up strict laws to protect those who do seek treatment. Now, experts worry that data collected on telehealth sites could bring about the harm [the law] was designed to prevent and more, even inadvertently.[21]

58.     These telehealth companies are collecting, in some instances, "ultra-sensitive personal data" about patients ranging from those seeking information about their reproductive rights and options, those seeking information regarding their addictions[22] and . . . those seeking mental health counseling.[23]

---

[21]     *Id.*

[22]     *See* Bill Toulas, *Mental health provider Cerebral alerts 3.1M people of data breach* (Mar. 10, 2023), https://www.bleepingcomputer.com/news/security/mental-health-provider-cerebral-alerts-31m-people-of-data-breach/, BLEEPINGCOMPUTER.COM (last visited Mar. 21, 2023).

[23]     Grace Oldham & Dhruv Mehrotra, *Facebook and Anti-Abortion Clinics Are Collecting Highly Sensitive Info on Would-Be Patients*, REVEAL (June 15, 2022), https://revealnews.org/article/facebook-data-abortion-crisis-pregnancy-

59.     As a result of its use of the Facebook Pixel, Cerebral sent data breach notices to 3.18 million people who interacted with its websites, applications and telehealth services.

**B.     *Underlying Website Technology Employed for the Purpose of Disclosing Plaintiff and Class Members' Private Information to Facebook.***

60.     Cerebral "offers long-term online care and medication management for a wide range of mental health conditions," from depression and PTSD to bipolar disorder and alcohol dependence, through therapy and medication.

61.     Defendant uses the Website to connect Plaintiff and Class Members to Defendant's digital healthcare platforms with the goal of increasing profitability.

62.     Defendant purposely installed the Pixel and other tracking tools on its Web Properties and programmed the Properties to surreptitiously share its patients' private and protected communications with Facebook, including communications that contain Plaintiff's and Class Members' PHI and PII.

---

center/ (noting that such "personal data can be used in a number of ways. The centers can deliver targeted advertising, on Facebook or elsewhere, aimed at deterring an individual from getting an abortion. It can be used to build anti-abortion ad campaigns – and spread misinformation about reproductive health – targeted at people with similar demographics and interests. And, in the worst-case scenario now contemplated by privacy experts, that digital trail might even be used as evidence against abortion seekers in states where the procedure is outlawed.") (last visited Mar. 20, 2023).

63.     In order to understand Defendant's unlawful data sharing practices, it is important to first understand basic web design and tracking tools.

64.     Facebook operates the world's largest social media company and generated $117 billion in revenue in 2021, roughly 97% of which was derived from selling advertising space.[24]

65.     In conjunction with its advertising business, Facebook encourages and promotes entities and website owners, such as Defendant, to utilize its "Business Tools" to gather, identify, target and market products and services to individuals.

66.     Facebook's Business Tools, including the Pixel, are bits of code that advertisers can integrate into their webpages, mobile applications, and servers, thereby enabling the interception and collection of user activity on those platforms.

67.     The Business Tools are automatically configured to capture "Standard Events" such as when a user visits a particular webpage, that webpage's Universal Resource Locator ("URL") and metadata, button clicks,

---

[24] META REPORTS FOURTH QUARTER AND FULL YEAR 2021 RESULTS, https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth-Quarter-and-Full-Year-2021-Results/default.aspx, INVESTOR.FB.COM (last visited Mar. 20, 2023).

CLASS ACTION COMPLAINT

1  etc.[25] Advertisers, such as Defendant, can track other user actions and can create

2  their own tracking parameters by building a "custom event."[26]

3      68.    One such Business Tool is the Pixel which "tracks the people and

4  type of actions they take."[27]

5      69.    When a user accesses a webpage that is hosting the Pixel, their

6  communications with the host webpage are instantaneously and surreptitiously

7  duplicated and sent to Facebook's servers—traveling from the user's browser to

8  Facebook's server.

9      70.    Notably, this transmission only occurs on webpages that contain the

10  Pixel. Thus, Plaintiff's and Class Member's Private Information would not have

11  been disclosed to Facebook via the Pixel but for Defendant's decisions to install

12

13  _____

[25]  *Specifications for Facebook Pixel Standard Events*,
14  https://www.facebook.com/business/help/402791146561655?id=1205376682832
142, FACEBOOK. COM (last visited Mar. 21, 2023); *see*, META PIXEL, GUIDES,
ADVANCED, https://developers.facebook.com/docs/facebook-pixel/advanced/,
15  FACEBOOK.COM (last visited Mar. 21, 2023); *see also* BEST PRACTICES FOR META
PIXEL SETUP,
16  https://www.facebook.com/business/help/218844828315224?id=1205376682832
142, FACEBOOK. COM (last visited Mar. 21, 2023); META MARKETING API, APP
17  EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/,
FACEBOOK. COM (last visited Mar. 21, 2023).
18  [26]  ABOUT STANDARD AND CUSTOM WEBSITE EVENTS,
https://www.facebook.com/business/help/964258670337005?id=1205376682832
19  142, FACEBOOK. COM (last visited Mar. 21, 2023); *see also* META MARKETING
API, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-
20  event-api/, FACEBOOK. COM (last visited Mar. 21, 2023).
[27]  RETARGETING, https://www.facebook.com/business/goals/retargeting,
21  FACEBOOK. COM (last visited Mar. 21, 2023).

1    the Pixel on its Web Properties.

2         71.    Similarly, Plaintiff's and Class Member's Private Information would

3    not have been disclosed to Facebook via CAPI but for Defendant's decision to

4    install and implement that tool on its Website.

5         72.    By installing and implementing both tools, Defendant caused

6    Plaintiff's and Class Member's communications to be intercepted and transmitted

7    to Facebook via the Pixel, and it caused a second improper disclosure of that

8    information via CAPI.

9         73.    As explained below, these unlawful transmissions are initiated by

10   Defendant's source code concurrent with communications made via the Web

11   Properties.

12   **C.    *Defendant's method of transmitting Plaintiff's and Class Members'***
     ***Private Information via the Meta Pixel.***

13

14        74.    Web browsers are software applications that allow consumers to

15   navigate the web and view and exchange electronic information and

16   communications over the internet.  Each "client device" (such as computer, tablet,

17   or smart phone) accesses web content through a web browser (e.g., Google's

18   Chrome browser, Mozilla's Firefox browser, Apple's Safari browser, and

19   Microsoft's Edge browser).

20   ///

21   ///

75.     Every website is hosted by a computer "server" that holds the website's contents and through which the entity in charge of the website exchanges communications with Internet users' client devices via web browsers.

76.     Web communications consist of HTTP Requests and HTTP Responses, and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies:

- **HTTP Request**: an electronic communication sent from the client device's browser to the website's server. GET Requests are one of the most common types of HTTP Requests.  In addition to specifying a particular URL (i.e., web address), GET Requests can also send data to the host server embedded inside the URL, and can include cookies.

- **Cookies**: a small text file that can be used to store information on the client device which can later be communicated to a server or servers.  Cookies are sent with HTTP Requests from client devices to the host server.  Some cookies are "third-party cookies" which means they can store and communicate data when visiting one website to an entirely different website.

- **HTTP Response**: an electronic communication that is sent as a reply to the client device's web browser from the host server in response to an HTTP Request. HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data. [28]

///

///

_____

[28]    One browsing session may consist of hundreds or thousands of individual HTTP Requests and HTTP Responses.

77.    A patient's HTTP Request essentially asks the Defendant's Website to retrieve certain information (such as a physician's "Book an Appointment" page), and the HTTP Response renders or loads the requested information in the form of "Markup" (the pages, images, words, buttons, and other features that appear on the patient's screen as they navigate Defendant's Website).

78.    Every website is comprised of Markup and "Source Code." Source Code is a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.

79.    Source code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the web browser's user.  The Pixel Defendant uses is source code that does just that.  The Pixel acts much like a traditional wiretap.

80.    When patients visit Defendant's Web Properties via an HTTP Request to Cerebral's server, Defendant's server sends an HTTP Response including the Markup that displays the Webpage visible to the user and Source Code including Defendant's Pixel.

81.    Thus, Defendant is in essence handing patients a tapped device, and once the Webpage is loaded into the patient's browser, the software-based wiretap is quietly waiting for private communications on the Webpage to trigger

CLASS ACTION COMPLAINT

1  the tap, which intercepts those communications intended only for Defendant and

2  transmits those communications to third parties, including Facebook and Google.

3      82.    Third parties, like Facebook, place third-party cookies in the web

4  browsers of users logged into their services.

5      83.    These cookies uniquely identify the user and are sent with each

6  intercepted communication to ensure the third-party can uniquely identify the

7  patient associated with the Personal Information intercepted.

8  **D.    *Cerebral Does Not Disclose That It Sends Private Information to Third Parties for Marketing Purposes.***

9

10     84.    Defendant's privacy policies represent to Plaintiff and Class

11  Members that Defendant will keep Private Information private and secure and

12  that it will only disclose Private Information under certain circumstances.[29]

13     85.    Defendant publishes several privacy policies that represent to

14  patients and visitors to its Website that Cerebral will keep sensitive information

15  confidential and that it will only disclose PII and PHI provided to it under certain

16  circumstances, ***none of which apply here***.

17     86.    Defendant publishes a Notice of Privacy Practices which tells

18  patients that Cerebral "may use and disclose your protected health information to

19  carry out treatment, payment, or business operations ***and for other legally***

20  _____

21  [29]  *Notice of Privacy Practices*, https://cerebral.com/privacy-practices, CEREBRAL.COM (last visited Mar. 21, 2023) (emphasis added).

CLASS ACTION COMPLAINT

*permissible purposes*."[30]

87.    Defendant's privacy policy does *not* permit Defendant to use and disclose Plaintiff's and Class Members' Private Information for marketing purposes. In fact, Defendant's Notice of Privacy Practices states:

> Your protected health information may be used and disclosed by our health care providers, our staff, and others outside of our office who are involved in your care and treatment for the purpose of providing health care services to you, to support our business operations, to obtain payment for your care, *and any other use authorized or required by law*.[31]

88.    Regarding uses and disclosures that allegedly do not require patient's authorization, Defendant states the following:

> To comply with applicable law, we may use or disclose your protected health information in the following situations without the need to obtain your authorization. These situations include the following uses and disclosures: as required by law; for public health activities; for health care oversight activities; pursuant to Food and Drug Administration requirements; for abuse, neglect, or domestic violence reporting; for judicial and administrative proceedings; for law enforcement purposes; to coroners and medical examiners, funeral directors and organ donation agencies; for certain research purposes; to avert serious threat to health or safety; for specialized government functions; for certain criminal activities; for workers' compensation reporting; relating to certain inmate reporting; and other required uses and disclosures. Under the law, we must make certain disclosures to you upon your request, and when required by the Secretary of the Department of Health and Human Services to investigate or determine our compliance with the requirements of the Health Insurance Portability and

---

[30] *Id.*
[31] *Id.* (emphasis added).

Accountability Act ("**HIPAA**").  State laws may further restrict these disclosures.

89.     Defendant's Privacy Notice also states that:

> *Other permitted and required uses and disclosures will be made only with your consent, authorization, or opportunity to object* unless permitted or required by law. *Without your authorization, we are expressly prohibited from using or disclosing your protected health information for marketing purposes. We may not sell your protected health information without your authorization*. Your protected health information will not be used for fundraising.[32]

90.     Defendant violated its own privacy policy by unlawfully intercepting and disclosing Plaintiff's and Class Members' Private Information to Facebook and third parties without adequately disclosing that Defendant shared Private Information with third parties and without acquiring the specific patients' consent or authorization to share the Private Information.

91.     Cerebral's promise that it will not sell its users' PHI without their authorization and consent is false.

92.     The Pixel, which is embedded in and throughout Defendant's Web Properties, collects search queries regarding users' personal information including their name and email, their medical conditions, treatment, and/or specific providers. Even non-Facebook users can be individually identified via the information gathered on the Web Properties, like an IP address or personal device

---

[32]     *Id*. (emphasis added).

1    identifying information.

2        93.    This is precisely the type of information for which HIPAA requires

3    the use of de-identification techniques to protect patient privacy.[33]

4        94.    Despite a lack of disclosure, Defendant allowed Facebook to "listen

5    in" on patients' confidential communications and to intercept and use for

6    advertising purposes the very information it promised to keep private.

7    **E.    *How Cerebral Discloses Plaintiff's and Class Members' Protected Health***

    **      *Information and Assists with Intercepting Communications***

8

9        95.    Despite warnings that healthcare companies were disclosing Private

10   Information to digital marketing companies by embedding and using Meta Pixels

11   (and similar technologies) at least as far back as January of 2020,[34] Cerebral did

12   not publicly acknowledge its participation in such illegal conduct until March of

13   this year.

14   ///

15   ///

16   _____

17   [33] https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html, HHS.GOV (last visited Mar. 16, 2023).

18   [34]    *See* Molly Osberg & Dhruv Mehrotra, *The Spooky, Loosely Regulated World of Online Therapy*, https://jezebel.com/the-spooky-loosely-regulated-world-of-online-therapy-1841791137, JEZEBEL.COM (last visited March 21,

19   2023); Todd Feathers, Simon Fondrie-Teitler, Angie Waller, & Surya Mattu, *Facebook Is Receiving Sensitive Medical Information from Hospital Websites*,

20   THEMARKUP.ORG, https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites (last visited

21   March 21, 2023).

CLASS ACTION COMPLAINT

96.     Specifically, on or about March 6, 2023, Cerebral posted a notice on its Website disclosing that it had been using invisible trackers from Google, Facebook, TikTok, and other third parties on its online services since October 12, 2019, stating the following:

> Cerebral Inc. ("Cerebral") takes your privacy seriously. We write to provide transparency regarding Cerebral's prior data sharing practices via Tracking Technologies (as defined below) on portions of its websites and mobile applications ("Cerebral's Platforms") and with certain subcontractors and other service providers ("Subcontractors").
>
> **What Happened?**
>
> Like others in many industries, including health systems, traditional brick and mortar providers, and other telehealth companies, Cerebral has used what are called "pixels" and similar common technologies ("Tracking Technologies"), such as those made available by Google, Meta (Facebook), TikTok, and other third parties ("Third Party Platforms"), on Cerebral's Platforms. Cerebral has used Tracking Technologies since we began operations on October 12, 2019. Cerebral recently initiated a review of its use of Tracking Technologies and data sharing practices involving Subcontractors. On January 3, 2023, Cerebral determined that it had disclosed certain information that may be regulated as protected health information ("PHI") under HIPAA to certain Third Party Platforms and some Subcontractors without having obtained HIPAA-required assurances.
>
> **What Information Was Involved?**
>
> The information disclosed varied depending on what actions you took on Cerebral's Platforms, the nature of the services provided by the Subcontractors, the configuration of Tracking Technologies when you used our services, the data capture configurations of the Third-Party Platforms, how you configured your device and browser, and other factors.

31

CLASS ACTION COMPLAINT

• If you created a Cerebral account, the information disclosed may have included your name, phone number, email address, date of birth, IP address, Cerebral client ID number, and other demographic or information.

• If, in addition to creating a Cerebral account, you also completed any portion of Cerebral's online mental health self-assessment, the information disclosed may also have included your selected service, assessment responses, and certain associated health information.

• If, in addition to creating a Cerebral account and completing Cerebral's online mental health self-assessment, you also purchased a subscription plan from Cerebral, the information disclosed may also have included subscription plan type, appointment dates and other booking information, treatment, and other clinical information, health insurance/ pharmacy benefit information (for example, plan name and group/ member numbers), and insurance co-pay amount.[35]

97.   Defendant's Notice admits that Defendant's Web Properties contain a Meta Pixel that secretly enabled the unauthorized transmission and disclosure of Plaintiffs and Class Members' Private Information to third parties such as Facebook, Google, TikTok, and others.

98.   The Private Information that Defendant discloses through the Meta Pixel and similar technologies is valuable to internet marketing companies like Facebook, Google, TikTok, and others as they receive, view, analyze, and aggregate the information to build consumer profiles to assist advertisers in

---

[35] *Notice of HIPAA Privacy Breach*, https://cerebral.com/static/hippa_privacy_breach-4000c6eb21449c2ecd8bd13706750cc2.pdf, CEREBRAL.COM (last visited March 21, 2023).

CLASS ACTION COMPLAINT

1    targeting desired demographics.  Accordingly, this lawsuit seeks to protect

2    Plaintiff's and Class Members' right to protect their Private Information, to

3    choose who receives it and how it is used, and to seek remedies for the harm

4    caused by Defendant's intentional, reckless, or negligent disclosure to

5    unauthorized third parties.

6        99.    Plaintiff never consented, agreed, authorized, or otherwise permitted

7    Defendant to disclose her personally identifiable information and protected health

8    information; nor did she authorize any assistance with intercepting her

9    communications.

10       100.   Plaintiff was not provided with any written notice that Defendant

11   discloses its Web Properties Users' protected health information until March of

12   2023; nor was she provided any means of opting out of such disclosures. Despite

13   this, Defendant knowingly disclosed Plaintiff's protected health information to

14   Facebook.

15       101.   By law, Plaintiff is entitled to privacy in her protected health

16   information and confidential communications. Defendant deprived Plaintiff and

17   Class Members of their privacy rights when it: (1) implemented a system that

18   surreptitiously tracked, recorded, and disclosed Plaintiff's and Class Members'

19   confidential communications, personally identifiable information, and protected

20   health information to a third party; (2) disclosed patients' protected information to

21   Facebook – an unauthorized third-party eavesdropper; and (3) undertook this

CLASS ACTION COMPLAINT

1  pattern of conduct without notifying Plaintiff and Class Members and without

2  obtaining their express written consent.

3  ***Federal Warning on Tracking Codes on Healthcare Websites.***

4      102.  Beyond Defendant's own policies, and those of Meta, the

5  government has issued guidance warning that tracking code like Meta Pixel may

6  come up against federal privacy law when installed on healthcare websites. The

7  statement, titled *Use of Online Tracking Technologies By HIPAA Covered*

8  *Entities And Business Associates* (the "Bulletin"), was recently issued by the

9  HHS' Office for Civil Rights ("OCR").[36]

10     103.  Healthcare organizations regulated under the HIPAA may use third-

11  party tracking tools, such as Google Analytics or Meta Pixel, in a limited way, to

12  perform analysis on data key to operations. They are not permitted, however, to

13  use these tools in a way that may expose patients' protected health information to

14  these vendors. The Bulletin explains:

15          Regulated entities [those to which HIPAA applies] are not
           permitted to use tracking technologies in a manner that would
16          result in impermissible disclosures of PHI to tracking
           technology vendors or any other violations of the HIPAA
17          Rules. ***For example, disclosures of PHI to tracking technology***
           ***vendors for marketing purposes, without individuals' HIPAA-***
18          ***compliant authorizations, would constitute impermissible***

19  ──────────────

20  [36]  *Use Of Online Tracking Technologies By HIPAA Covered Entities And*
     *Business Associates*, https://www.hhs.gov/hipaa/for-
21  professionals/privacy/guidance/hipaa-online-tracking/index.html, HHS.GOV (last
     visited Mar. 21, 2023).

CLASS ACTION COMPLAINT

1        *disclosures.*[37]

2        104.   The bulletin discusses the types of harm that disclosure may cause to

3   the patient:

> An impermissible disclosure of an individual's PHI not only
> violates the Privacy Rule but also may result in a wide range of
> additional harms to the individual or others. For example, an
> impermissible disclosure of PHI may result in identity theft,
> financial loss, ***discrimination, stigma, mental anguish, or
> other serious negative consequences to the reputation, health,
> or physical safety of the individual or to others identified in
> the individual's PHI.*** Such disclosures can reveal incredibly
> sensitive information about an individual, ***including diagnoses,
> frequency of visits to a therapist or other health care
> professionals, and where an individual seeks medical
> treatment.*** While it has always been true that regulated entities
> may not impermissibly disclose PHI to tracking technology
> vendors, ***because of the proliferation of tracking technologies
> collecting sensitive information, now more than ever, it is
> critical for regulated entities to ensure that they disclose PHI
> only as expressly permitted or required by the HIPAA Privacy
> Rule.***[38]

14        105.   Plaintiff and Class members face the same risks the government is

15  warning about. Defendant has shared Plaintiff's and Class Members' search terms

16  about health conditions for which they seek doctors; their contacts with doctors to

17  make appointments; the names of their doctors; the frequency with which they

18  take steps to obtain healthcare for certain conditions; and where they seek

19

20  [37]    *Id.* (emphasis added).

21  [38]    *Id.* (emphasis added.)

CLASS ACTION COMPLAINT

medical treatment. This information is, as described by the OCR bulletin, "highly sensitive." The Bulletin goes on to make clear how broad the government's view of protected information is. It explains:

> This information might include an individual's medical record number, home or email address, or dates of appointments, as well as an individual's IP address or geographic location, medical device IDs, *or any unique identifying code.*[39]

106. Crucially, that paragraph in the government's Bulletin continues:

> *All such [individually identifiable health information ("IIHI")] collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services.* This is because, *when a regulated entity collects the individual's IIHI through its website or mobile app, the information connects the individual to the regulated entity (i.e., it is indicative that the individual has received or will receive health care services or benefits from the covered entity), and thus relates to the individual's past, present, or future health or health care or payment for care.*[40]

107. There is further evidence that Defendant shared protected Personal Information. Defendant admitted as much in its Notice of HIPAA Privacy Breach. The sharing of that information violated Plaintiff's and Class Members' rights.

///

---

[39]   *Id.* (emphasis added.)
[40]   *Id.* (emphasis added.)

CLASS ACTION COMPLAINT

*Defendant's HIPAA Violation*

108.   Defendant's disclosure of Plaintiff's and Class Members' Private Information to entities like Facebook also violated HIPAA. HIPAA provided Plaintiff and Class members with another reason to believe that the information they communicated to Defendant through its Website would be protected, rather than shared with third parties for marketing purposes.

109.   HIPAA's Privacy Rule defines "individually identifiable health information" as "a subset of health information, including demographic information collected from an individual" that is (1) "created or received by a health care provider;" (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual;" and either (i) "identifies the individual;" or (ii) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

110.   HIPAA prohibits health care providers from "us[ing] or disclos[ing] 'protected health information "except as permitted or required by" the HIPAA Privacy Rule. 45 C.F.R. § 164.502.

111.   A covered entity may determine that health information is not individually identifiable health information only if either (A) "a person with appropriate knowledge of and experience with generally accepted statistical and

scientific methods for rendering information not individually identifiable: (i) applying such principles" "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information," to identify individuals, and (ii) documents the methods that justifies such a determination, or (B) identifiers of the individual are removed that include: names; Internet Protocol (IP) addresses; account numbers; URLs; device identifiers; and "any other unique identifying number, characteristic or code," except codes assigned by the healthcare organization to allow itself to reidentify information from which it has removed identifying information.[41]

112.   Even the fact that an individual is receiving a medical service, i.e., is a patient of a particular entity, can be Protected Health Information. The Department of Health and Human Services has instructed health care providers that, while identifying information alone is not necessarily PHI if it were part of a public source such as a phonebook because it is not related to health data, "[i]f such information was listed with health condition, health care provision or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI."[42]

---

[41]   *Guidance Regarding Methods for De-Identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html, HHS.GOV (last visited Mar. 21, 2023).

[42]   *Id.*

CLASS ACTION COMPLAINT

113.   Consistent with this restriction, the HHS has issued marketing guidance that provides, "With limited exceptions, the [Privacy] Rule requires an individual's written authorization before a use or disclosure of her or her protected health information can be made for marketing . . . Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list."[43]

114.   Here, Defendant provided patient information to third parties in violation of the Privacy Rule.

115.   Commenting on a June 2022 report discussing the use of the Meta Pixel by hospitals and medical centers, David Holtzman, a health privacy consultant and a former senior privacy adviser in HHS OCR, which enforces HIPAA, stated, "I am deeply troubled by what [the hospitals] are doing with the capture of their data and the sharing of it … It is quite likely a HIPAA violation."[44]

///

_____

[43]    *Marketing*, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/marketing/index.html, HHS.GOV (last visited Mar. 21, 2023).

[44]    '*Deeply Troubled*': *Security experts worry about Facebook trackers on hospital sites*, ADVISORY BOARD, https://www.advisory.com/daily-briefing/2022/06/17/data-trackers (last visited Mar. 21, 2023).

116.   Defendant's placing a third-party tracking code on its Web Properties is a violation of Plaintiff's and Class Members' privacy rights under federal law. While Plaintiff does not bring a claim under HIPAA itself, this violation demonstrates Defendant's wrongdoing relevant to other claims and establishes its duty to maintain patient privacy.

***Plaintiff's and Class Members' Private Information Hold Financial Value***

117.   Plaintiff's private data has economic value. Indeed, Meta's, Google's and others' practices of using such information to package groups of people as "Lookalike Audiences" and similar groups and selling those packages to advertising clients demonstrates the financial worth of that data.

118.   Data harvesting is the fastest growing industry in the nation. As software, data mining, and targeting technologies have advanced, the revenue from digital ads and the consequent value of the data used to target them have risen rapidly.

119.   Consumer data is so valuable that some have proclaimed that data is the new oil. Between 2016 and 2018, the value of information mined from Americans increased by 85% for Facebook and 40% for Google. Overall, the value internet companies derive from Americans' personal data increased almost 54%. Conservative estimates suggest that in 2018, Internet companies earned $202 per American user. In 2022, that value is expected to be $200 billion industry wide, or $434 per user, which is also a conservative estimate.

CLASS ACTION COMPLAINT

120.   As to health data specifically, as detailed in an article in Canada's National Post:

> As part of the multibillion-dollar worldwide data brokerage industry, health data is one of the most sought-after commodities. De-identified data can be re identified and brazen decisions to release records with identifiable information are becoming commonplace).[45]

121.   Further demonstrating the financial value of Class Members' medical data, CNBC has reported that hospital executives have received a growing number of bids for user data:

> Hospitals, many of which are increasingly in dire financial straits, are weighing a lucrative new opportunity: selling patient health information to tech companies. Aaron Miri is chief information officer at Dell Medical School and University of Texas Health in Austin, so he gets plenty of tech start-ups approaching him to pitch deals and partnerships. Five years ago, he'd get about one pitch per quarter. But these days, with huge data-driven players like Amazon and Google making incursions into the health space, and venture money flooding into Silicon Valley start-ups aiming to bring machine learning to health care, the cadence is far more frequent. "It's all the time," he said via phone. "Often, once a day or more."
>
> * * *
>
> [H]ealth systems administrators say [the data] could also be used in unintended or harmful ways, like being cross-referenced with other data to identify individuals at higher risk of diseases and then raise their health

---

[45]   Iris Kulbatski, *Iris Kulbatski*: *The dangers of electronic health records*, NATIONAL POST, Feb. 26, 2020, https://nationalpost.com/opinion/iris-kulbatski-the-dangers-of-electronic-health-records (last visited Mar. 21, 2023).

CLASS ACTION COMPLAINT

1    premises, or to target advertising to individuals.[46]

2

3    122.   The CNBC article also explained:

4    [D]e-identified patient data has become its own small
     economy: There's a whole market of brokers who

5    compile the data from providers and other health-care
     organizations and sell it to buyers. Just one company

6    alone, IQVIA, said on its website that it has access to
     more than 600 million patient records globally that are

7    nonidentified, much of which it accesses through
     provider organizations. The buyers, which include

8    pharma marketers, will often use it for things like clinical
     trial recruiting But hospital execs worry that this data

9    may be used in unintended ways, and not always in the
     patient's best interest.

10   123.   Tech companies are under particular scrutiny because they already

11   have access to a massive trove of information about people, which they use to

12   serve their own purposes. For instance, the health data Google collects could

13   eventually help it micro-target advertisements to people with certain health

14   conditions. Policymakers are proactively calling for a revision and potential

15   upgrade of the HIPAA privacy rules out of concern for what might happen as tech

16   companies continue to march into the medical sector.[47]

17   ///

18

19   _____

20   [46]   Christina Farr, *Hospital execs say they are getting flooded with requests for
     your health data* (Dec. 18, 2019), https://www.cnbc.com/2019/12/18/hospital-
     execs-say-theyre-flooded-with-requests-for-your-health-data.html, CNBC.COM
     (last visited Mar. 21, 2023).

21   [47]   *Id.*

42

CLASS ACTION COMPLAINT

124.    Similarly, a Time Magazine article titled, *How your Medical Data Fuels A Hidden Multi-Billion Dollar Industry*, referenced the "growth of the big health data bazaar," in which patients' health information is sold. It reported that:

> [T]he secondary market in information unrelated to a patient's direct treatment poses growing risks, privacy experts say. That's because clues in anonymized patient dossiers make it possible for outsiders to determine your identity, especially as computing power advances in the future.[48]

125.    Cerebral gave away Plaintiff's and Class Members' communications and transactions on its Web Properties without permission. The unauthorized access to Plaintiff's and Class Members' private and Personal Information has diminished the value of that information, resulting in harm to Website Users, including Plaintiff and Class Members.

***Defendant Violated Industry Standards***

126.    It is a cardinal rule that a medical provider's duty of confidentiality is embedded in the physician-patient and hospital-patient relationship.

127.    The American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications.

---

[48]    Adam Tanner, *How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry* (Jan. 9, 2017), Time, https://time.com/4588104/medical-data-industry/ (last visited Mar. 21, 2023).

128.   AMA Code of Ethics Opinion 3.1.1 provides:

Protecting information gathered in association with the care of the patient is a core value in health care… Patient privacy encompasses a number of aspects, including, … personal data (informational privacy)[.]

129.   AMA Code of Medical Ethics Opinion 3.2.4 provides:

Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (A) Only provide data that has been de-identified. [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity about the purposes for which access would be granted.

130.   AMA Code of Medical Ethics Opinion 3.3.2 provides:

Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically…must: (c) Release patient information only in keeping ethics guidelines for confidentiality.[49]

---

[49]   AMA Principles of Medical Ethics: I, IV, *Chapter 3: Opinions on Privacy, Confidentiality & Medical Records*, https://www.ama-assn.org/sites/ama-assn.org/files/corp/media-browser/code-of-medical-ethics-chapter-3.pdf, American Medical Association (last visited Mar. 21, 2023).

44

CLASS ACTION COMPLAINT

1     *Plaintiff's & Class Members' Reasonable Expectation of Privacy*

2         131.   Plaintiff and Class Members were aware of Defendant's duty of

3   confidentiality when they sought medical services from Defendant.

4         132.   Indeed, at all times when Plaintiff and Class Members provided their

5   PII and PHI to Defendant, they each had a reasonable expectation that the

6   information would remain confidential and that Defendant would not share the

7   Private Information with third parties for a commercial purpose, unrelated to

8   patient care.

9   *IP Addresses are Personally Identifiable Information*

10        133.   In addition to name, phone number, email address, date of birth,

11   Cerebral client ID number, the service selected, assessment responses, patient

12   status, medical conditions, treatment, provider information, appointment

13   information, and patient's unique and persistent Facebook ID, Defendant

14   improperly disclosed Plaintiff's and Class Members' computer IP addresses to

15   Facebook through the use of the Pixel.

16        134.   An IP address is a number that identifies the address of a device

17   connected to the Internet.

18        135.   IP addresses are used to identify and route communications on the

19   Internet.

20   ///

21   ///

136.   IP addresses of individual Internet users are used by Internet service providers, Websites, and third-party tracking companies to facilitate and track Internet communications.

137.   Facebook tracks every IP address ever associated with a Facebook user.

138.   Google also tracks IP addresses associated with Internet users.

139.   Facebook, Google, and other third-party marketing companies track IP addresses for use of tracking and targeting individual homes and their occupants with advertising by using IP addresses.

140.   Under HIPAA, an IP address is considered personally identifiable information, defining personally identifiable information as including "any unique identifying number, characteristic or code" and specifically listing IP addresses among examples.  45 C.F.R. § 164.514 (2).

141.   HIPAA further declares information as personally identifiable where the covered entity has "actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information." 45 C.F.R. § 164.514(2)(ii); *see also*, 45 C.F.R. § 164.514(b)(2)(i)(O).

142.   Consequently, Defendant's disclosure of Plaintiff's and Class Members' IP addresses violated HIPAA and industry-wide privacy standards.

*///*

1  ***Defendant was Enriched by Using The Pixel.***

2      143.   Defendant used the Facebook Pixel on its Web Properties for its own

3  purposes of marketing and profits.

4      144.   In exchange for disclosing patients' personally identifiable

5  information, Defendant receives compensation from Facebook in the form of

6  enhanced advertising services and more cost-efficient marketing on Facebook.

7      145.   Based on information and belief, Defendant was advertising its

8  services on Facebook, and the Pixel was used to "help [Defendant] understand

9  which types of ads and platforms are getting the most engagement[.]"[50]

10      146.   Retargeting is a form of online marketing that targets users with ads

11  based on their previous Internet communications and interactions.

12      147.   Upon information and belief, Defendant re-targeted patients and

13  potential patients to get more patients to use its services. These patients include

14  Plaintiff and Class Members.

15      148.   By utilizing the Pixel, the cost of advertising and retargeting was

16  reduced, thereby benefitting and enriching Defendant.

17  ***Plaintiff Jane Doe's Experience with Cerebral***

18      149.   Plaintiff Jane Doe accessed and used the Web Properties to seek

19  medical treatment and/or advice throughout 2021. Plaintiff reasonably expected

20  _____

21  [50]   RETARGETING, https://www.facebook.com/business/goals/retargeting,
FACEBOOK. COM (last visited Mar. 21, 2023).

that her communications with Cerebral via the Web Properties were confidential, solely between herself and Cerebral, and that such communications would not be transmitted to or intercepted by any third party without her full knowledge and informed consent.

150.   As described more fully herein, Cerebral sent Plaintiff's private medical information and other individually identifiable information to Facebook when she used the Web Properties, completed health assessments, looked for providers, booked appointments, received prescriptions, and interacted with healthcare providers through the Web Properties.

151.   As a condition of receiving Defendant's services, Plaintiff disclosed her Private Information to Defendant on numerous occasions.

152.   Plaintiff accessed Defendant's Web Properties on her phone and computer to receive healthcare services from Defendant and at Defendant's direction.

153.   Plaintiff signed up for Defendant's services, completed Defendant's medical and mental health questionnaires, and scheduled doctor's appointments for herself via the Defendant's Web Properties.

154.   Plaintiff used and continues to use the same devices to maintain and access an active Facebook account throughout the relevant period for this case.

155.   Plaintiff reasonably expected that her communications with Defendant via the Website were confidential, solely between herself and

1   Defendant, and that such communications would not be transmitted to or

2   intercepted by a third party.

3       156.   Plaintiff provided her Private Information to Defendant and trusted

4   that the information would be safeguarded according to Defendant's policies and

5   state and federal law.

6       157.   As described herein, Defendant worked with Facebook to intercept

7   Plaintiff's communications, including those that contained Private and

8   confidential information.

9       158.   Defendant willfully facilitated these interceptions without Plaintiff's

10  knowledge, consent, or express written authorization.

11      159.   Defendant transmitted Plaintiff Doe's Facebook ID, computer IP

12  address, and other device and online identifiers to Facebook. Defendant also

13  transmitted information such as username and password; online and device

14  identifiers; protected characteristics such as age, gender, religion, race and

15  ethnicity; and health and medical information including medical history, the type

16  of medical treatment sought, Plaintiff's particular health condition, patient status,

17  and the fact that Plaintiff attempted to or did book a medical appointment.

18      160.   By making these disclosures without Plaintiff's consent, Defendant

19  breached Plaintiff's privacy and unlawfully disclosed her Private Information.

20      161.   Defendant did not inform Plaintiff that it had shared her Private

21  Information with Facebook.

162.   Plaintiff suffered damages in the form of (i) invasion of privacy; (ii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iii) loss of benefit of the bargain; (iv) diminution of value of the Private Information; (v) statutory damages; and (vi) the continued and ongoing risk to her Private Information.

163.   Plaintiff Doe has a continuing interesting in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected, and safeguarded from future unauthorized disclosure.

## TOLLING

164.   Any applicable statute of limitations has been tolled by the "delayed discovery" rule. Plaintiff did not know (and had no way of knowing) that her PII and PHI was intercepted and unlawfully disclosed because Defendant did not disclose that information until March 1, 2023.

## CLASS ACTION ALLEGATIONS

165.   Plaintiff Doe brings this action on behalf of herself and on behalf of all other persons similarly situated ("the Class") pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

166.   The Nationwide Class that Plaintiff seeks to represent is defined as follows:

///

All individuals residing in the United States whose Private Information was disclosed to a third party without authorization or consent through the Pixel on Defendant's Website and Web Properties.

167.   Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

168.   Plaintiff reserves the right to modify or amend the definition of the proposed class before the Court determines whether certification is appropriate.

169.   **Numerosity, Fed R. Civ. P. 23(a)(1).** The Nationwide Class members are so numerous that joinder of all members is impracticable. Upon information and belief, there are over one million individuals whose PII and PHI may have been improperly accessed by Facebook, and the Class is identifiable within Defendant's records.

170.   **Commonality & Predominance, Fed. R. Civ. P. 23(a)(2) and (b)(3).** Questions of law and fact common to the Classes exist and predominate over any questions affecting only individual Class Members. These include:

    a.   Whether and to what extent Defendant has a duty to protect the PII and PHI of Plaintiff and Class Members;

    b.   Whether Defendant owes a duty to not disclose the PII and PHI of Plaintiff and Class Members to unauthorized third parties;

///

c.    Whether Defendant violated its privacy policy by disclosing the PII and PHI of Plaintiff and Class Members to Facebook, Google, and/or other third parties.

d.    Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their PII and PHI would be disclosed to third parties;

e.    Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their PII and PHI had been compromised;

f.    Whether Defendant adequately addressed and fixed the practices which permitted the disclosure of patient PHI and PII;

g.    Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII and PHI of Plaintiff and Class Members;

h.    Whether Defendant violated consumer protection statutes invoked herein;

i.    Whether Plaintiff and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct;

j.    Whether Defendant knowingly made false representations as to its data security and/or privacy policy practices;

k.    Whether Defendant knowingly omitted material representations with respect to its data security and/or privacy policy practices; and

l.    Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of Defendant's disclosure of their PII and PHI.

171.   **Typicality, Fed. R. Civ. P. 23(a)(3).** Plaintiff's claims are typical of those of other Class Members because all had their PII and PHI compromised as a result of Defendant's incorporation of the Meta Pixel and due to Defendant's

misfeasance.

172.   **Adequacy, Fed. R. Civ. P. 23(a)(4).** Plaintiff will fairly and adequately represent and protect the interests of Class Members in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiff seeks no relief that is antagonistic or adverse to the Class Members, and the infringement of rights and the damages Plaintiff has suffered are typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

173.   **Superiority and Manageability, Fed. R. Civ. P. 23(b)(3).** Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, such individual actions would still be economically impractical and impose a burden on the courts.

CLASS ACTION COMPLAINT

174.   **Policies Generally Applicable to the Class.** This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly, and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

175.   The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendant would otherwise gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

CLASS ACTION COMPLAINT

176.    The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

177.    **Ascertainability & Notice**. Membership in the Class can be determined by objective records maintained by Defendant, and adequate notice can be given to Class Members directly using information maintained in Defendant's records.

178.    **Class-wide Injunctive Relief, Fed. R. Civ. P. 23(b)(2).** Unless a Class-wide injunction is issued, Defendant may continue to fail to properly secure the Private Information of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the practices complained of herein, and Defendant may continue to act unlawfully as set forth in this Complaint as Defendant has acted or refused to act on grounds generally applicable to the Class. Accordingly, final injunctive or corresponding declaratory relief with regard to the Class as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

179.    Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

1

2

♦ Whether Defendant owes a legal duty to not disclose Plaintiff's and Class Members' Private Information;

3

4

♦ Whether Defendant owes a legal duty to not disclose Plaintiff's and Class Members' Private Information under Defendant's privacy policy;

5

6

♦ Whether Defendant breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

7

8

♦ Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

9

10

♦ Whether Defendant adequately and accurately informed Plaintiff and Class Members that their Private Information would be disclosed to third parties;

11

12

♦ Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties; and

13

14

♦ Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

15   Plaintiff reserves the right to amend or modify the Class definition as this case

16   progresses.

17   ///

18   ///

19   ///

20   ///

21   ///

CLASS ACTION COMPLAINT

## CLAIMS FOR RELIEF

## COUNT I

### Violation of the California Invasion of Privacy Act
### Cal. Penal Code §§ 630, *et. seq.*

180.   Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein and brings this count individually and on behalf of the proposed Class.

181.   The California Invasion of Privacy Act ("CIPA") is codified at California Penal Code §§ 630 to 638.

182.   CIPA begins with its statement of purpose.

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

Cal. Penal Code § 630.

183.   California Penal Code § 631(a) provides, in pertinent part:

> Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this

57

CLASS ACTION COMPLAINT

state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars ($2,500)[.]

184.   A defendant must show it had the consent of all parties to a communication.

185.   At all relevant times, Defendant aided, employed, agreed with, and conspired with Facebook to track and intercept Plaintiff's and Class Members' internet communications while using Defendant's Web Properties. These communications were intercepted by a third party during the communications and without the knowledge, authorization, or consent of Plaintiff and Class Members.

186.   Defendant intentionally inserted an electronic device into its Web Properties that, without the knowledge and consent of Plaintiff and Class members, recorded and transmitted the substance of their confidential communications with Defendant to a third party.

187.   Defendant willingly facilitated Facebook's interception and collection of Plaintiff's and Class Members' private medical information by embedding the Pixel(s) on the Web Properties, thereby assisting Facebook's eavesdropping.

188.   The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, the Pixel falls under the

58

broad catch-all category of "any other manner":

    a.   The computer codes and programs Facebook used to track Plaintiff's and Class Members' communications while they were navigating the Website;

    b.   Plaintiff's and Class Members' browsers;

    c.   Plaintiff's and Class Members' computing and mobile devices;

    d.   Facebook's web and ad servers;

    e.   The web and ad servers from which Facebook tracked and intercepted Plaintiff's and Class Members' communications while they were using a web browser to access or navigate the Website;

    f.   The computer codes and programs used by Facebook to effectuate its tracking and interception of Plaintiff's and Class Members' communications while they were using a browser to visit the Website; and

    g.   The plan Facebook carried out to effectuate its tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser or mobile application to visit the Web Properties.

189.   Defendant fails to disclose to Users that it is using the Pixel to track and automatically and simultaneously transmit highly sensitive personal communications to a third party. Defendant is necessarily aware that these communications are confidential as its Website Notice of Privacy Practices acknowledges the confidential nature of private medical information and disclaims that it is being shared with unidentified third parties without Plaintiff's and Class Members' express authorization.

59

CLASS ACTION COMPLAINT

190.   The patient communication information that Defendant transmits while using the Pixel constitutes protected health information.

191.   As demonstrated herein, Defendant violates CIPA by aiding and permitting third parties to receive its patients' online communications in real time through its Web Properties without their consent.

192.   By disclosing Plaintiff's and Class Members' private health information, Defendant violated Plaintiff's and Class Members' statutorily protected right to privacy.

193.   As a result of the above violations and pursuant to CIPA Section 637.2, Defendant is liable to Plaintiff and Class Members for treble actual damages related to their loss of privacy in an amount to be determined at trial, or for statutory damages in the amount of $5,000 per violation. Section 637.2 specifically states that "[i]t is not a necessary prerequisite to an action pursuant to this section that the Plaintiff has suffered, or be threatened with, actual damages."

194.   Under the statute, Defendant is also liable for reasonable attorney's fees, litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by the Defendant in the future.

///

///

///

# COUNT II

**Violation of the California Confidentiality of Medical Information Act**
**Cal. Civ. Code §§ 56, *et seq*.**

195.   Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed Class.

196.   The California Confidentiality of Medical Information Act, California Civil Code §§ 56, et seq. ("CMIA") prohibits health care providers from disclosing medical information relating to their patients without patient authorization. "Medical information" refers to "any individually identifiable information, in electronic or physical form, in possession of or derived from a provider of health care . . . regarding a patient's medical history, mental or physical condition, or treatment. 'Individually Identifiable' means that the medical information includes or contains any element of personal identifying information sufficient to allow identification of the individual[.]" Cal. Civ. Code § 56.05.

197.   Defendant is a "provider of health care" as defined by California Civil Code § 56.06(b).

198.   Plaintiff and Class Members are patients, and, as a health care provider, Defendant has an ongoing obligation to comply with the CMIA's requirements. As set forth above, device identifiers, web URLs, Internet Protocol

CLASS ACTION COMPLAINT

1   (IP) addresses, and other characteristics that can uniquely identify Plaintiff and

2   Class Members are transmitted to Defendant in combination with patient medical

3   conditions, medical concerns, treatment(s) sought by the patients, medical history,

4   appointment information and other medical information. This is protected health

5   information under the CMIA.

6       199.   This private medical information is intercepted and transmitted to

7   Facebook via Defendant's knowing and intentional decision to embed enabling

8   software into its Web Properties. Facebook ID is also an identifier sufficient to

9   allow identification of an individual. Along with patients' Facebook ID,

10  Defendant discloses to Facebook several pieces of information regarding patient

11  use of its Web Properties, including but not limited to the following: patient

12  medical conditions, medical concerns, treatment(s) sought by the patients,

13  medical specialty of the doctor(s) searched for and selected by patients, and

14  appointment information.

15      200.   The information described above constitutes medical information

16  pursuant to the CMIA because it is patient information derived from a provider of

17  health care regarding patients' medical treatment and physical condition, and this

18  medical information is linked with individually identifying information. Cal. Civ.

19  Code § 56.05(i).

20  ///

21  ///

CLASS ACTION COMPLAINT

201.   As demonstrated herein, Defendant fails to obtain its patients' authorization for the disclosure of medical information and fails to disclose in its Web Properties Notice of Privacy Practices that it shares protected health information with Facebook or other third parties for marketing purposes.

202.   Pursuant to CMIA Section 56.11, a valid authorization for disclosure of medical information must be: (1) "Clearly separate from any other language present on the same page and is executed by a signature which serves no other purpose than to execute the authorization;" (2) signed and dated by the patient or her representative; (3) state the name and function of the third party that receives the information; and (4) state a specific date after which the authorization expires. Accordingly, the information set forth in Defendant's Website Privacy Notice do not qualify as a valid authorization.

203.   As described above, Defendant is violating the CMIA by disclosing its patients' medical information to Facebook along with the patients' individually identifying information. Accordingly, Plaintiff and Class Members seek all relief available for Defendant's CMIA violations.

204.   Plaintiff and Class Members seek nominal damages, compensatory damages, punitive damages, attorney fees, and costs of litigation for Defendant's violation(s) of the CMIA.

///

///

## COUNT III

### Invasion of Privacy Under California's Constitution

205.   Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed Class.

206.   Plaintiff and Class Members have an interest in: (1) precluding the dissemination and/or misuse of their sensitive, confidential communications and protected health information; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to wiretaps without Plaintiff's and Class Members' knowledge or consent.

207.   At all relevant times, by using Facebook's Meta Pixel to record and communicate patients' FIDs and other individually identifying information alongside their confidential medical communications, Defendant invaded Plaintiff's and Class Members' privacy rights under the California Constitution.

208.   Plaintiff and Class Members had a reasonable expectation that their communications, identity, health information, and other data would remain confidential, and that Defendant would not install wiretaps on its Web Properties to secretly transmit communications to a third party.

///

209.   Plaintiff and Class Members did not authorize Defendant to record and transmit Plaintiff's and Class Members' private medical communications alongside their personally identifiable health information to a third party.

210.   This invasion of privacy is serious in nature, scope, and impact because it relates to patients' private medical communications. Moreover, it constitutes an egregious breach of the societal norms underlying the privacy right.

211.   As a result of Defendant's actions, Plaintiff and Class Members have suffered harm and injury, including but not limited to an invasion of their privacy rights.

212.   Plaintiff and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

213.   Plaintiff and Class Members seek appropriate relief for their injuries, including but not limited to damages that will reasonably compensate Plaintiff and Class Members for the harm to their privacy interests as a result of the intrusion(s) upon Plaintiff's and Class Members' privacy.

214.   Plaintiff seeks all other relief as the Court may deem just, proper, and available for invasion of privacy under the California Constitution.

///

///

///

1

## COUNT IV

## Common Law Invasion of Privacy – Intrusion Upon Seclusion

2

3    215.    Plaintiff repeats the allegations contained in the foregoing

4    paragraphs as if fully set forth herein and brings this claim individually and on

5    behalf of the proposed Class.

6    216.    Plaintiff and Class Members had a reasonable expectation of privacy

7    in their communications with Defendant via its Web Properties and the

8    communication platforms and services therein.

9    217.    Plaintiff and Class Members communicated sensitive and protected

10   medical information and individually identifiable information that they intended

11   for only Defendant to receive and that they understood Defendant would keep

12   private.

13   218.    Defendant's disclosure of the substance and nature of those

14   communications to third parties without the knowledge and consent of Plaintiff

15   and Class Members is an intrusion on Plaintiff's and Class Members' solitude or

16   seclusion.

17   219.    Plaintiff and Class Members had a reasonable expectation of privacy

18   because Defendant's Web Properties Notice of Privacy Practices states that they

19   can expect such privacy. Moreover, Plaintiff and Class Members have a general

20   expectation that their communications regarding healthcare with their healthcare

21   providers will be kept confidential. Defendant's disclosure of private medical

1  information coupled with individually identifying information is highly offensive

2  to the reasonable person.

3      220.   As a result of Defendant's actions, Plaintiff and Class Members have

4  suffered harm and injury, including but not limited to an invasion of their privacy

5  rights.

6      221.   Plaintiff and Class Members have been damaged as a direct and

7  proximate result of Defendant's invasion of their privacy and are entitled to just

8  compensation, including monetary damages.

9      222.   Plaintiff and Class Members seek appropriate relief for these

10  injuries, including but not limited to damages that will reasonably compensate

11  Plaintiff and Class Members for the harm to their privacy interests as a result of

12  the intrusion(s) upon Plaintiff's and Class Members' privacy.

13      223.   Plaintiff seeks all other relief as the Court may deem just and proper.

14  ## COUNT V
## Breach of Implied Contract

15

16      224.   Plaintiff repeats the allegations contained in the foregoing

17  paragraphs as if fully set forth herein and brings this claim individually and on

18  behalf of the proposed Class.

19      225.   When Plaintiff and Class Members provided their Private

20  Information to Defendant in exchange for services, they entered into an implied

21  contract by which Defendant agreed to safeguard and not disclose such Private

Information without consent.

226.   Plaintiff and Class Members accepted Defendant's offers of services and provided their Private Information to Defendant via the Web Properties.

227.   Plaintiff and Class Members would not have entrusted Defendant with their Private Information in the absence of an implied contract between them that included Defendant's promise to not disclose Private Information without consent.

228.   Defendant breached these implied contracts by disclosing Plaintiff's and Class Members' Private Information to third parties, including Facebook.

229.   As a direct and proximate result of Defendant's breaches of these implied contracts, Plaintiff and Class Members sustained damages as alleged herein. Plaintiff and Class Members would not have used Defendant's services, or would have paid substantially less for these services, had they known their Private Information would be disclosed.

230.   Plaintiff and Class Members are entitled to compensatory and consequential damages as a result of Defendant's breach of implied contract.

**COUNT VI**
**Breach of Confidence**

231.   Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed Class.

232.   Medical providers have a duty to keep patients' non-public medical information completely confidential.

233.   Plaintiff and Class Members had reasonable expectations of privacy in their communications exchanged with Defendant, including communications exchanged on Defendant's Web Properties, because Defendant is in the business of providing medical and mental health care.

234.   Plaintiff's and Class Members' reasonable expectations of privacy in the communications exchanged with Defendant are further supported by Defendant's express promises in its Privacy Policies.

235.   In breach of its duties as a medical provider and its express promises of confidentiality, Defendant deployed the Meta Pixel to disclose and transmit Plaintiff's Private Information and the contents of private healthcare communications exchanged with Defendant to third parties.

236.   The third-party recipients included, but were not limited to, Facebook, Google, TikTok, and other online marketers.

237.   Defendant's disclosures of Plaintiff's and Class Members' Private Information were made without their knowledge, consent, or authorization, and were unprivileged.

238.   As a direct result of Defendant's breach of provider-patient confidentiality, Defendant eroded the essential confidential relationship between a healthcare provider and patient.

CLASS ACTION COMPLAINT

239.   As a direct and proximate cause of Defendant's unauthorized

disclosures of patient personally identifiable, non-public medical information, and

communications, Plaintiff and Class members were damaged by Defendant's

breach, including the following:

    a.   Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private;

    b.   Defendant eroded the essential confidential nature of the provider-patient relationship;

    c.   Defendant took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without compensating Plaintiff and Class Members for the data;

    d.   Plaintiff and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality;

    e.   Defendant's actions diminished the value of Plaintiff's and Class Members' Private Information; and

    f.   Defendant's actions violated the property rights Plaintiff and Class Members have in their Private Information.

240.   Plaintiff and Class Members are therefore entitled to general

damages for invasion of their rights in an amount to be determined by a jury and

nominal damages for each independent violation.

///

1

## COUNT VII

2

### Violations of Electronic Communications Privacy Act ("ECPA")
### 18 U.S.C. § 2511(1) *et seq.*
3
### Unauthorized Interception, Use, and Disclosure

4      241.   Plaintiff repeats the allegations contained in the foregoing

5 paragraphs as if fully set forth herein and brings this claim individually and on

6 behalf of the proposed Class.

7      242.   The ECPA protects both sending and receipt of communications.

8      243.   18 U.S.C. § 2520(a) provides a private right of action to any person

9 whose wire or electronic communications are intercepted, disclosed, or

10 intentionally used in violation of Chapter 119.

11      244.   The transmissions of Plaintiff's PII and PHI to Defendant's Website

12 qualifies as a "communication" under the ECPA's definition of 18 U.S.C. §

13 2510(12).

14      245.   Electronic Communications. The transmission of PII and PHI

15 between Plaintiff and Class Members and Defendant's Web Properties with

16 which they chose to exchange communications are "transfer[s] of signs, signals,

17 writing, . . . data, [and] intelligence of [some] nature transmitted in whole or in

18 part by a wire, radio, electromagnetic, photoelectronic, or photooptical system

19 that affects interstate commerce" and are therefore "electronic communications"

20 within the meaning of 18 U.S.C. § 2510(2).

21 ///

246.   <u>Content</u>. The ECPA defines content, when used with respect to electronic communications, to "include[] ***any information concerning the substance, purport, or meaning of that communication***." 18 U.S.C. § 2510(8) (emphasis added).

247.   <u>Interception</u>. The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents . . . include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

248.   <u>Electronical, Mechanical, or Other Device</u>. The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

        a.    Plaintiff's and Class Members' browsers;

        b.    Plaintiff's and Class Members' computing devices;

        c.    Defendant's web-servers; and,

        d.    The Pixel Code deployed by Defendant to effectuate sending and acquiring patient communications.

249.   By utilizing and embedding the Pixel on its Web Properties, Defendant intentionally intercepted, endeavored to intercept, and/or procured another person to intercept, the electronic communications of Plaintiff and Class

1   Members, in violation of 18 U.S.C. § 2511(1)(a).

2       250.   Specifically, Defendant intercepted Plaintiff's and Class Members'

3   electronic communications via the Meta Pixel, which tracked, stored, and

4   unlawfully disclosed Plaintiff's and Class Members' Private Information to third

5   parties such as Facebook.

6       251.   Defendant intercepted communications that include, but are not

7   limited to, communications to/from Plaintiff and Class Members regarding PII

8   and PHI, treatment, medication, and scheduling.

9       252.   By intentionally disclosing or endeavoring to disclose Plaintiff's and

10  Class Members' electronic communications to affiliates and other third parties,

11  while knowing or having reason to know that the information was obtained

12  through the interception of an electronic communication in violation of 18 U.S.C.

13  § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

14      253.   By intentionally using, or endeavoring to use, the contents of

15  Plaintiff's and Class Members' electronic communications, while knowing or

16  having reason to know that the information was obtained through the interception

17  of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant

18  violated 18 U.S.C. § 2511(1)(d).

19      254.   Unauthorized Purpose. Defendant intentionally intercepted the

20  contents of Plaintiff's and Class Members' electronic communications for the

21  purpose of committing a tortious act in violation of the Constitution or laws of the

1    United States or of any State – namely, invasion of privacy, among others.

2        255.   Defendant used the wire or electronic communications to increase its

3    profit margins. Defendant specifically used the Pixel to track and utilize Plaintiff's

4    and Class Members' PII and PHI for financial gain.

5        256.   Defendant was not acting under color of law to intercept Plaintiff's

6    and the Class Members' wire or electronic communication.

7        257.   Plaintiff and Class Members did not authorize Defendant to acquire

8    the content of their communications for purposes of invading Plaintiff's privacy

9    via the Pixel tracking code.

10       258.   Any purported consent that Defendant received from Plaintiff and

11   Class Members was not valid.

12       259.   In sending and in acquiring the content of Plaintiff's and Class

13   Members' communications relating to the browsing of Defendant's Website,

14   Defendant's purpose was tortious, criminal, and designed to violate federal and

15   state legal provisions including a knowing intrusion into a private place,

16   conversation, or matter that would be highly offensive to a reasonable person.

17       260.   A person who violates § 2511(1)(a) is liable for $10,000 in statutory

18   damages to any person whose wire, oral, or electronic communication is

19   intercepted, disclosed, or intentionally used.

20       261.   For the same reasons as set forth above for Plaintiff's CIPA Claims,

21   Defendant is liable to Plaintiff and Class Members for violations of the ECPA.

1
2
3

**COUNT VIII**
**Violations of Electronic Communications Privacy Act ("ECPA")**
**18 U.S.C. § 2511(3)(a),** *et seq.*
**Unauthorized Divulgence By Electronic Communications Service**

4          262.   Plaintiff repeats the allegations contained in the foregoing

5    paragraphs as if fully set forth herein and brings this claim individually and on

6    behalf of the proposed Class.

7          263.   The ECPA Wiretap statute provides that "a person or entity

8    providing an electronic communication service to the public shall not

9    intentionally divulge the contents of any communication (other than one to such

10   person or entity, or an agent thereof) while in transmission on that service to any

11   person or entity other than an addressee or intended recipient of such

12   communication or an agent of such addressee or intended recipient." 18 U.S.C. §

13   2511(3)(a).

14         264.   Electronic Communication Service. An "electronic communication

15   service" is defined as "any service which provides to users thereof the ability to

16   send or receive wire or electronic communications." 18 U.S.C. § 2510(15).

17         265.   Defendant's Web Properties are electronic communication services.

18   The Web Properties provide Users the ability to send or receive electronic

19   communications. In the absence of Defendant's Web Properties, internet users

20   could not send or receive communications regarding Plaintiff's and Class

21   Members' PII and PHI.

266.   <u>Intentional Divulgence</u>. Defendant intentionally utilized the Tracking Pixel and was, or should have been aware, that it could divulge Plaintiff's and Class Members' PII and PHI.

267.   <u>While in Transmission</u>. Upon information and belief, divulgence of the contents of Plaintiff's and Class Members' communications was contemporaneous with their exchange with Defendant's Web Properties, to which they directed their communications.

268.   Defendant divulged the contents of Plaintiff's and Class Members' communications to Facebook or other third parties without Plaintiff's and Class Members' consent and/or authorization.

269.   <u>Exceptions do not apply</u>. In addition to the exception for communications directly to an ECS or an agent of an ECS, the Wiretap Act states that "[a] person or entity providing electronic communication service to the public may divulge the contents of any such communication as follows:

   a.   "as otherwise authorized in section 2511(2)(a) or 2517 of this title;"

   b.   "with the lawful consent of the originator or any addressee or intended recipient of such communication;"

   c.   "to a person employed or authorized, or whose facilities are used, to forward such communication to its destination;" or

///

///

d.   "which were inadvertently obtained by the service provider and which appear to pertain to the commission of a crime, if such divulgence is made to a law enforcement agency." 18 U.S.C. § 2511(3)(b).

270.   Section 2511(2)(a)(i) provides: "It shall not be unlawful under this chapter for an operator of a switchboard, or an officer, employee, or agent of a provider of wire or electronic communication service, whose facilities are used in the transmission of a wire or electronic communication, to intercept, disclose, or use that communication in the normal course of his employment while engaged in any activity which is a necessary incident to the rendition of his service or to the protection of the rights or property of the provider of that service, except that a provider of wire communication service to the public shall not utilize service observing or random monitoring except for mechanical or service quality control checks."

271.   Defendant's divulgence of the contents of Plaintiff's and Class Members' communications on Defendant's Web Properties to a third party was not authorized by 18 U.S.C. § 2511(2)(a)(i) in that it was neither: (1) a necessary incident to the rendition of Defendant's service; nor (2) necessary to the protection of the rights or property of Defendant.

272.   Defendant's divulgence of the contents of user communications on Defendant's browser through the Pixel code was not done "with the lawful consent of the originator or any addresses or intended recipient of such

communication[s]." As alleged above: (a) Plaintiff and Class Members did not authorize Defendant to divulge the contents of their communications; and (b) Defendant did not procure the "lawful consent" from the Websites or apps with which Plaintiff and Class Members were exchanging information.

273.   Moreover, Defendant divulged the contents of Plaintiff's and Class Members' communications through the Meta Pixel to individuals who are not "person[s] employed or whose facilities are used to forward such communication to its destination."

274.   The contents of Plaintiff's and Class Members' communications did not appear to pertain to the commission of a crime and Defendant did not divulge the contents of their communications to a law enforcement agency.

275.   As a result of the above actions and pursuant to 18 U.S.C. § 2520, the Court may assess statutory damages; preliminary and other equitable or declaratory relief as may be appropriate; and reasonable attorneys' fees and other litigation costs reasonably incurred.

276.   A person who violates § 2511(3)(a) is liable for $10,000 in statutory damages to any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used.

277.   For the same reasons as set forth above for Plaintiff's CIPA Claims, Defendant is liable to Plaintiff and Class Members for violations of the ECPA.

CLASS ACTION COMPLAINT

# COUNT IX
## Violation of Computer Fraud and Abuse Act ("CFAA")
## 18 U.S.C. § 1030 *et seq.*

278.   Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed Class.

279.   Plaintiff's and the Class's mobile devices are, and at all relevant times have been, used for interstate communication and commerce, and are therefore "protected computers" under 18 U.S.C. § 1030(e)(2)(B).

280.   Defendant exceeded, and continues to exceed, authorized access to the Plaintiff's and the Class's protected computers and obtained information through that access in violation of 18 U.S.C. § 1030(a)(2)(C).

281.   Defendant's conduct caused "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value" under 18 U.S.C. § 1030(c)(4)(A)(i)(I), inter alia, because of the secret transmission of Plaintiff's and Class Members' private and personally identifiable data and content – including the Web Properties User's electronic communications with the Web Properties, including their mouse movements, clicks, keystrokes (such as text being entered into an information field or text box), URLs of web pages visited, and/or other electronic communications in real time ("Web Properties Communications"), which were never intended for public consumption or transmission.

///

282.   Defendant's conduct also constitutes "a threat to public health or safety" under 18 U.S.C. § 1030(c)(4)(A)(i)(IV) due to Plaintiff's and Class Members' Private Information of being made available to Defendant, Facebook, and/or other third parties without adequate legal privacy protections.

283.   Accordingly, Plaintiff and the Class are entitled to "maintain a civil action against [Defendant] to obtain compensatory damages and injunctive relief or other equitable relief." 18 U.S.C. § 1030(g).

### COUNT X
### Violation of The Unfair Competition Law ("UCL")
### Cal. Bus. & Prof. Code § 17200, *et seq.* – Unlawful Business Practices

284.   Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed Class.

285.   Plaintiff, Class Members, and Defendant are each a "person" under Cal. Bus. & Prof. Code § 17201.

286.   The acts, omissions, and conduct of Defendant as alleged herein constitute "business practices" within the meaning of the UCL.

287.   California Business and Professions Code §§ 17201, *et seq.* prohibits acts of unfair competition, which includes unlawful business practices.

288.   Plaintiff brings her claim for injunctive relief as she has no confidence that Defendant has altered its privacy practices and she may wish to use Defendant's services in the future.

CLASS ACTION COMPLAINT

289.   Plaintiff brings her claim for restitution in the alternative to her claims for damages.

290.   Defendant engaged in unlawful business practices by disclosing Plaintiff's and Class Members' Private Information to unrelated third parties, including Facebook, without prior consent in violation of the consumer protection and privacy statutes alleged herein. Defendant's unlawful acts and practices include violations of Plaintiff's and Class Member's constitutional rights to privacy; Cal. Penal Code §§ 630, *et. seq.* ; Cal. Civ. Code §§ 56, *et. seq.* ; 18 U.S.C. § 2511(1), *et seq.*; 18 U.S.C. § 2511(3)(a), *et seq.*; and 18 U.S.C. § 1030, *et seq.*

291.   Based on information and belief, the acts, omissions, and conduct of Defendant as alleged herein emanated and was directed from Defendant's California headquarters.

292.   Because Defendant is in the business of providing medical and mental healthcare services, Plaintiff and Class Members relied on Defendant to advise them of any potential disclosure of their private information. Plaintiff and Class Members were entitled to assume, and did assume, that Defendant would take appropriate measures to keep their private information private and confidential.

293.   Plaintiff viewed and relied upon Defendant's representations in its privacy policies concerning the confidentiality of information provided by

patients like Plaintiff and Class Members to Defendant. Defendant was in sole possession of and had a duty to disclose the material information that Plaintiff's and Class Members' private information was being shared with a third party.

294.   Had Defendant disclosed that it shared Private Information with third parties, Plaintiff would not have used Defendant's services or would have paid considerably less for those services.

295.   The harm caused by the Defendant's conduct outweighs any potential benefits attributable to such conduct and there were reasonably available alternatives to further Defendant's legitimate business interests other than Defendant's conduct described herein.

296.   As a direct result of their reliance on Defendant's representations that it would keep personal information confidential, Plaintiff and Class Members shared highly sensitive information through their use of the Web Properties, causing them to suffer damages when Defendant disclosed that information to a third party.

297.   As a direct result of Defendant's violations of the UCL, Plaintiff and Class Members have suffered injury in fact and lost money or property, including but not limited to payments to Defendant and/or other valuable consideration, such as access to their private and personal data. The unauthorized access to Plaintiff's and Class Members' private and personal data also diminished the value of that information.

298.   As a direct result of its unlawful practices, Defendant has been unjustly enriched and should be required to make restitution to Plaintiff and Class Members pursuant to §§ 17203 and 17204 of the California Business & Professions Code, disgorgement of all profits accruing to Defendant because of its unlawful business practices, declaratory relief, attorney's fees and costs (pursuant to Cal. Code Civ. Proc. §1021.5), and injunctive or other equitable relief.

## COUNT XI
## Violation of The Unfair Competition Law ("UCL")
## Cal. Bus. & Prof. Code § 17200, *et seq.*

299.   Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed Class.

300.   Defendant engaged in unfair business practices by disclosing Plaintiff's and Class Members' Private Information to unrelated third parties, including Facebook, without prior consent despite its promises to keep such information confidential. Defendant's unfair business practices included widespread violations of Plaintiff's and Class Members' rights to privacy, including its failure to inform the public that using its Web Properties would result in disclosing very private information to a third party.

///

301.   Because Defendant is in the business of providing medical and mental healthcare services, Plaintiff and Class Members relied on Defendant to advise them of any potential disclosure of their private information. Plaintiff and Class Members were entitled to assume, and did assume, that Defendant would take appropriate measures to keep their private information private and confidential.

302.   Plaintiff viewed and relied upon Defendant's representations in its privacy policies concerning the confidentiality of information provided by patients like Plaintiff and Class Members to Defendant. Defendant was in sole possession of and had a duty to disclose the material information that Plaintiff's and Class Members' private information was being shared with a third party.

303.   Had Defendant disclosed that it shared Private Information with third parties, Plaintiff would not have used Defendant's services or would have paid considerably less for those services.

304.   The harm caused by the Defendant's conduct outweighs any potential benefits attributable to such conduct and there were reasonably available alternatives to further Defendant's legitimate business interests other than Defendant's conduct described herein.

305.   Defendant's acts, omissions, and conduct also violate the unfair prong of the UCL because those acts, omissions, and conduct, as alleged herein, offended public policy (including the aforementioned federal and state privacy

CLASS ACTION COMPLAINT

statutes and state consumer protection statutes, such as HIPAA and CIPA, the ECPA, and CFAA, and constitute immoral, unethical, oppressive, and unscrupulous activities that caused substantial injury, including to Plaintiff and Class Members.

306.   As a direct result of their reliance on Defendant's representations that it would keep personal information confidential, Plaintiff and Class Members shared highly sensitive information through their use of the Web Properties, causing them to suffer damages when Defendant disclosed that information to a third party.

307.   As a direct result of Defendant's violations of the UCL, Plaintiff and Class Members have suffered injury in fact and lost money or property, including but not limited to payments to Defendant and/or other valuable consideration, such as access to their private and personal data. The unauthorized access to Plaintiff's and Class Members' private and personal data also diminished the value of that information.

308.   As a direct result of its unfair practices, Defendant has been unjustly enriched and should be required to make restitution to Plaintiff and Class Members pursuant to §§ 17203 and 17204 of the California Business & Professions Code, disgorgement of all profits accruing to Defendant because of its unlawful business practices, declaratory relief, attorney's fees and costs (pursuant to Cal. Code Civ. Proc. §1021.5), and injunctive or other equitable

1  relief.

2                        **<u>PRAYER FOR RELIEF</u>**

3          Plaintiff, individually and on behalf of the proposed Class, respectfully

4  requests that the Court grant the following relief:

5                 a.      Certification of this action as a class action,
                          appointment of Plaintiff as Class Representative, and
6                         appointment of Plaintiff's counsel as Class Counsel;

7                 b.      A declaratory judgment that Defendant violated
                          applicable federal and California laws as well as
8                         Plaintiff's and Class Members' privacy rights as
                          provided at common law and pursuant to the
9                         California Constitution;

10                c.      An order enjoining Defendant from engaging in the
                          unlawful practices and illegal acts described herein; and
11

12                d.      An order awarding Plaintiff and the Class: (1) actual or
                          statutory damages; (2) prejudgment interest on all
                          amounts awarded; (3); injunctive relief as the Court may
13                        deem proper; (4) reasonable attorney fees, expenses,
                          and costs of suit pursuant to California Code of Civil
14                        Procedure § 1021.5 and/or other applicable law; and
                          (5) such other and further relief as the Court may
15                        deem appropriate.

16  ///

17  ///

18  ///

19  ///

20  ///

21  ///

CLASS ACTION COMPLAINT

1

<u>**DEMAND FOR JURY TRIAL**</u>

Plaintiff, on behalf of herself and the proposed Class, demands a trial by jury for all claims asserted herein and so triable.

Date: March 23, 2023            **LIPPSMITH LLP**

By: _____
Graham B. LippSmith (SBN 221984)
g@lippsmith.com
MaryBeth LippSmith (SBN 223573)
mb@lippsmith.com
Jaclyn L. Anderson (SBN 258609)
jla@lippsmith.com
555 S. Flower Street, Suite 4400
Los Angeles, CA 90071
Tel: (213) 344-1820
Fax: (213) 513-2495

**ALMEIDA LAW GROUP LLC**
David S. Almeida (*Pro Hac Vice forthcoming*)
david@almeidalawgroup.com
Elena Belov (*Pro Hac Vice forthcoming*)
elena@almeidalawgroup.com
849 W. Webster Avenue
Chicago, IL 60614
Tel: (312) 576-3024

*Attorneys for Plaintiff and the Putative Classes*

CLASS ACTION COMPLAINT